IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-00549-CV-W-REL-SSA |
| | ) | |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER REMANDING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jacqueline Harris seeks review of the final decision of the Commissioner of Social

Security denying her application for disability insurance benefits under Title II of the Social Security

Act ("the Act"), 42 U.S.C. §§ 401, et seq., and for supplemental security income benefits under Title

XVI of the Act, 42 U.S.C. §§ 1381, et seq. Plaintiff argues that the Administrative Law Judge

("ALJ") erred: (1) by posing improper hypothetical questions to the vocational expert ; (2) in finding

her depression was not disabling; (3) in discrediting the opinion of Nurse Practicioner Edna Hamera;

(4) by failing to consider the impact of her obesity; and (5) by discrediting her subjective complaints

of pain. I find that the ALJ properly (1) found Plaintiff's depression was not disabling, (2)

discredited Nurse Practicioner Hamera's opinion, (3) considered the impact of Plaintiff's obesity,

and (4) discredited Plaintiff's subjective complaints of pain. However, I find that the ALJ did not

pose proper hypothetical questions to the vocational expert. Plaintiff's Motion for Summary

Judgment will, therefore, be remanded in part and denied in part. The Commissioner's decision will

be affirmed with respect to her findings regarding Plaintiff's depression, her consideration of

Plaintiff's obesity, and her decision to discredit Plaintiff's subjective complaints of pain, and

remanded due to her failure to include manipulative limitations in the hypothetical questions posed to the vocational expert.

## *I. BACKGROUND*

Plaintiff protectively filed her application for both Social Security Disability Insurance Benefits and Supplemental Security Income Benefits on February 27, 2002, alleging that she had been disabled since February 2, 2001. Plaintiff's alleged disability and inability to work stems from heart problems. Plaintiff's application was denied initially and upon reconsideration. On February 28, 2005, a hearing was held before an ALJ. At the hearing, Plaintiff amended her alleged onset date to January of 2002. On March 8, 2005, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On April 15, 2005, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## *II. STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). This same standard also applies to Title XVI, as the "final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g)." 42 U.S.C. § 1383(c)(3). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488

2

(1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)(citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). This court's review must be "more than a mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A) (governing disability insurance benefits); 42 U.S.C. § 1382c(a)(3)(A) (governing supplemental security income benefits). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. See Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998) (discussing burden in supplemental security income benefits case); see also Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988)(discussing burden in disability insurance benefits case); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983)(discussing burden in disability insurance benefits case).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. §§ 404.1520(c) and 416.920(c) and can be summarized as follows:

1.      Is the claimant performing substantial gainful activity?
        Yes = not disabled.
        No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

### IV.  THE RECORD

The record consists of the testimony of Plaintiff and vocational expert Amy Salva, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff's earnings record indicates that she earned the following income from 1975

through 2001:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1975 | $ 420.00 | 1988 | $15,725.89 |
| 1976 | 632.50 | 1989 | 3,106.26 |
| 1977 | 460.00 | 1990 | 6,821.88 |
| 1978 | 1,311.93 | 1991 | 10,096.74 |
| 1979 | 1,213.34 | 1992 | 20,645.76 |
| 1980 | 4,656.39 | 1993 | 12,398.13 |
| 1981 | 3,639.20 | 1994 | 10,741.76 |
| 1982 | 7,757.53 | 1995 | 20,392.33 |
| 1983 | 9,104.57 | 1996 | 25,842.84 |
| 1984 | 10,351.47 | 1997 | 20,467.01 |
| 1985 | 12,030.00 | 1998 | 29,631.74 |
| 1986 | 13,353.95 | 1999 | 29,500.01 |
| 1987 | 13,815.81 | 2000 | 20,236.04 |
|      |          | 2001 | 10,375.31 |

(Tr. at 103, 105-113).

### Activities of Daily Living Questionnaire

Plaintiff indicated she lived with her family and spent a typical day caring for her kids

(Tr. at 118). At the time she filled out the questionnaire, Plaintiff took Ibuprofen, Nitroglycerin[1]

---

[1]Nitroglycerin is "in a class of drugs called nitrates. Nitroglycerin dilates (widens) blood vessels (arteries and veins). When blood vessels are dilated, it is easier for the heart to pump and for blood to flow to the heart. Nitroglycerin is used to prevent angina attacks . . . and to treat attacks once they have started." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00321a1; _ylt=AjENZd3VawwGjUsUzTmZIxwkD7sF.

5

Furosemide,[2] Zestril,[3] and Aspirin; she did not need any helping taking her medications (Tr. at 118). She was five feet, two inches tall and weighed two hundred and sixty pounds (Tr. at 119).

If Plaintiff's head is too low she has difficulty sleeping because she has trouble breathing (Tr. at 118). Plaintiff's sister helps her wash, due to problems with Plaintiff's left hand (Tr. at 118). Plaintiff's sister also prepares all meals, except for breakfast (Tr. at 119). Plaintiff is able to do some house work; she spends approximately thirty minutes washing dishes and caring for her children (Tr. at 119). Plaintiff's daughter now has to help her with these tasks, whereas she could perform them on her own before her illness (Tr. at 119).

Plaintiff goes shopping for food and clothing every two weeks with her sister (Tr. at 120). Her sister drives, helps lift heavier items, and carries the bags when shopping (Tr. at 120). Although she has a driver's license, Plaintiff does not drive (Tr. at 120). She takes public transportation (Tr. at 120). If she needs assistance, Plaintiff's nephew or kids help her travel (Tr. at 120).

Plaintiff watches television and reads books daily (Tr. at 121). She does not have trouble concentrating on or understanding the programs or materials she reads (Tr. at 121). Plaintiff goes out to eat with family and friends (Tr. at 121). She has not experienced problems getting along with others (Tr. at 122). Changes in routine upset Plaintiff because she is "often a busy woman"

---

[2]Furosemide is "in a class of drugs called loop diuretics (water pills). It decreases the amount of fluid in the body by increasing the amount of salt and water lost in the urine." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00070a1;_ylt=AmI.0S8EJRAXDo2a4Q.aL6wkD7sF.

[3]Zestril is "used to lower blood pressure, to treat congestive heart failure, and to improve the survival rate after a heart attack." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00732a1;_ylt= AlrouBEeKNHXVKHWhkuxEeYkD7sF.

6

(Tr. at 122). She stated she used to work two jobs and did not have to depend on anyone for anything (Tr. at 122). Now, she cannot work due to shortness of breath and constant pain in her left arm (Tr. at 122).

### Heart Problem Questionnaire

Plaintiff reported she had been in the hospital overnight for her heart problem (Tr. at 123). She last saw her treating doctor, Kristine Phillips, two months prior to filling out the questionnaire and planned to see her again on July 22nd (Tr. at 123). Plaintiff experiences chest discomfort and shortness of breath, but is not fatigued (Tr. at 123). Her pain feels like sharp pressure and spreads into her arms and legs (Tr. at 123). The pain lasts for a few minutes; she tries to stop the discomfort by lying down and resting (Tr. at 123). Plaintiff has had an EKG (Tr. at 123).

Plaintiff's usual daily activities have been affected by her heart problem in that she experiences shortness of breach, pain in her left arm, and is unable to walk for a long time (Tr. at 123). She stated her sister did all of the housework (Tr. at 124). She and her sister go shopping for food, clothing, and other items every two weeks (Tr. at 125). Plaintiff indicated she did not need help with shopping (Tr. at 125). When she leaves the house, Plaintiff sometimes takes public transportation with the assistance of her nephew (Tr. at 125). Plaintiff loves to roller skate, but is no longer able to do so (Tr. at 124).

### Reconsideration Disability Report

Plaintiff reported that her condition had worsened since filing her claim because, in addition to her heart attack, her left arm and knee are swollen and it is difficult to lift with her hand (Tr. at 126). She described sometimes feeling like she had a stroke (Tr. at 126). However,

Plaintiff stated her daily activities of living had not changed (Tr. at 128). She reported difficulty using her hands due to the swelling and difficulty breathing when she walked too fast (Tr. at 130).

## Heart Problem Questionnaire

Plaintiff stated she first saw a doctor for her heart problem in February of 2002 (Tr. at 132). She reported chest discomfort, fatigue, and shortness of breath (Tr. at 132). The pain was sharp and felt like pins and needles and lasted approximately fifteen to twenty minutes (Tr. at 132). Plaintiff has had an EKG, a nuclear heart scan, and will have a treadmill stress test in the future (Tr. at 132). She cannot long take long walks or lift heavy items due to the pain (Tr. at 132).

Plaintiff reported not doing any housework or other odd jobs around the house because it was hard for her to lift and carry items (Tr. at 133). She does, however, care for her children with the help of her sister and nephew (Tr. at 133). Plaintiff stated her medications made her tired (Tr. at 133). She and her sister go shopping for food approximately once a month (Tr. at 134). Her sister drives and helps with the lifting (Tr. at 134). Plaintiff stated she did not drive; her nephew goes with her when she takes public transportation (Tr. at 134).

## Activities of Daily Living Questionnaire

Plaintiff stated her sister cooked and did the laundry (Tr. at 135). When Plaintiff does cook, she needs help opening cans and lifting the pots and pans (Tr. at 136). She also needs help taking laundry out of the machine (Tr. at 136). Plaintiff stated she was capable of handling her own money and paying her bills (Tr. at 137). She goes grocery shopping for approximately two and a half hours every month, during which time she requires help lifting (Tr. at 137). Plaintiff

reported driving "sometimes" and stated public transportation was not available in her area (Tr. at 137). During the day, Plaintiff watches television, cares for her young children, and reads (Tr. at 137). She only reported difficulty reading when the words were small (Tr. at 137). She is no longer able to go skating (Tr. at 137).

Plaintiff reported experiencing constant pain in her left arm (Tr. at 140). She explained she is unable to work, due to difficulty lifting her left hand, shortness of breath and headaches (Tr. at 141). Plaintiff is able to pay bills, use a checkbook, complete a money order, and count change; however, she does have some trouble writing since she is left handed (Tr. at 143). She reported being able to shop with her sister's assistance; she could not do laundry, do the dishes, made a bed/change the sheets, iron, vacuum, take out the trash, do car maintenance, go to the post office, or do banking (Tr. at 143, 144). She said she has never been able to do home repairs, mow the lawn, rake leaves, or do any gardening (Tr. at 143). Plaintiff's sister cooks the meals so that she does not have to do any lifting (Tr. at 144).

An average day for Plaintiff includes bathing her children and feeding them breakfast (Tr. at 144). She takes her medication, dresses her children and fixes their hair (Tr. at 144). Plaintiff then dresses herself (Tr. at144). Throughout the morning, she cleans up after her children and reads them books (Tr. at 144). After lunch, the children take a nap (Tr. at 144). Plaintiff is able to watch television for an extended period of time without difficulty (Tr. at 144). She also reads books, does puzzles and uses a computer to check her e-mail (Tr. at 145). Plaintiff reported having a driver's licence, and driving to go shopping once a month and to go to the doctor (Tr. at 145).

Finally, Plaintiff stated that her problems did not start until she had a heart attack (Tr. at

146).  Sometimes she feels like she had a slight stroke (Tr. at 146).  Plaintiff stated she is in so much pain, all she does is take multiple medications that make her tired (Tr. at 146).

### Claimant Questionnaire Supplement

Plaintiff reported staying very busy caring for her young children (ages 1 ½ and 5) (Tr. at 147).  She walks up the street to the park, but starts to breathe heavily if she walks too fast (Tr. at 147).  Her symptoms limit her ability to sit, in that her left leg goes numb if she sits too long (Tr. at 147).  She has to walk very slowly due to difficulty breathing (Tr. at 147).  Plaintiff reported only being able to lift and carry with her right hand, and using her left hand very little (Tr. at 147).  She described being limited in bending, kneeling, squatting, climbing stairs, reaching forward and backward, and working or reaching overhead (Tr. at 147).  Plaintiff's pain is located primarily in the left side of her body (Tr. at 147).  Her knee, left hand and fingers stay swollen a lot (Tr. at 147).  Plaintiff stated she was in pain much of the time and when she has sharp pain in her chest, her arm also throbs (Tr. at 147).  She reported not being able to "do anything but cry" (Tr. at 147).

### Pain Questionnaire

Plaintiff provided the following description of her pain:

The pain is located on the left side of my body start[s] with my shoulder [and] work[s] it's [sic] way down to my wrist[.]  I also have pain in my knee [and] ankle.

It frequently move[s] around from top to bottom[.]  Sometime[s] I can't even bend my knee or stand on my feet the pain is terribly painful.

I feel like someone is sticking me with knives and turning them from side to side and there's nothing I could do about it but cry and take medication and that [is] a bad feeling.

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 10 of 53

The pain comes and goes frequent[ly] and anything I do is painful[.] I stay in pain day and night[.] Sometime[s] I don't think the medication is helping me anymore because I have [been] taking it for some time.

I experience pain when I'm sleeping[,] when I'm sit[t]ing[,] walking[,] laying [sic] or whatever I do I'm in pain[.] [I]t feel[s] like it's never going to leave me.

The pain prevent[s] me from being on my feet a long period of time[.] The pain is so severe I can't hold my hand up in the air without feeling it.

I take medication but it still isn't releasing the pain[.] [I]t seem[s] like nothing work[s] anymore.

The activities that I used to do where [sic] camping[,] bowling[,] rollerskating[,] bikeriding and also playing with my kids[.] Basically the thing[s] that me and my kids were able to do I no longer can do do [sic] to the pain and swelling that I have on my left side and shortness of breath.

I was a person who never took any medication until I had a heart problem and now I have frequent pain and [am] taking all kind[s] of medication that seem to do nothing for me but put me to sleep and made me feel drows[y] and weak.

(Tr. at 171-172).

### A. SUMMARY OF MEDICAL RECORDS

On May 30, 2002, Plaintiff's left hand and left wrist were scanned (Tr. at 200-201). Results showed diffuse soft tissue swelling of the fingers without underlying osseous[4] abnormality (Tr. at 200).

On July 17, 2002, Plaintiff was seen by Bruce Bochman, D.O., of the Massachusetts Rehabilitation Commission Disability Determination Services (Tr. at 179-183). Dr. Bochman stated Plaintiff had been treated for congestive heart failure since January of 2002 (Tr. at 179-180). She stated she had symptoms of congestive heart failure throughout her last pregnancy and

---

[4]"Osseous" is defined as "[b]ony, of bone-like consistency or structure." STEDMAN'S MEDICAL DICTIONARY 1266 (26th ed. 1995).

Case 4:05-cv-00549-REL    Document 17    Filed 09/29/06    Page 11 of 53

(Tr. at 179). She complained of shortness of breath and intermittent swelling in both ankles and feet (Tr. at 179). She also stated she has had pain in her left arm, forearm and left hand, in association with left chest pain that developed approximately three months ago (Tr. at 179). She stated she was hospitalized for observation and study, but that there was no official diagnosis yet (Tr. at 179). Plaintiff reported X-rays of her left forearm and hand have been negative and that she has had significant pain in her left wrist as well as left shoulder (Tr. at 179-180).

Plaintiff arrived at her appointment, via medical transport, with her two children (Tr. at 180). She stated she did not drive but used public transportation (Tr. at 180). She reported being able to carry a small bag of groceries and carry a gallon of milk (Tr. at 180). The heaviest thing she has lifted in the past month is her son, who weights approximately twenty pounds (Tr. at 180). Her only problems with walking and climbing stairs are shortness of breath, which "no doubt relate to her congestive heart failure, her hypertension, and her obesity" (Tr. at 181).

Plaintiff reported being able to cook meals, clean her home, do laundry, go shopping, manage money, care for her children, socialize with friends, shower and dress herself (Tr. at 181). She stated that in a typical day, she "feeds the kids and dresses them" (Tr. at 181). She is not able to work because of shortness of breath and pain in her left arm (Tr. at 181).

Physical examination revealed that at 5' 2" and 269 pounds, Plaintiff was markedly obese (Tr. at 181). Dr. Bochman described her gait as somewhat slow and wide-based due to obesity (Tr. at 181). "She cannot perform a full squat because of her obesity and her stance demonstrates some lumbar lordosis,[5] again due to her obesity." (Tr. at 181). Examination of

---

[5]Lordosis is "[a]n abnormal extension deformity; antero-posterior curvature of the spine, generally lumbar with the convexity looking anteriorly." STEDMAN'S MEDICAL DICTIONARY 996 (26th ed. 1995).

Plaintiff's heart revealed a normal sinus rhythm (Tr. at 182). The posterior myocardial infarction was in the left fifth intercostal space approximately 1" lateral to the MCL. No murmurs, gallops or rubs were audible (Tr. at 182).

Plaintiff's left arm abduction was limited to 70 degrees (Tr. at 182). There was palpatory tenderness over the left subacromial bursa[6] and the left deltoid muscle (Tr. at 182). Flexion of the left forearm was limited to approximately 45 degrees and flexion of the left wrist was markedly limited due to pain and mild swelling (Tr. at 182). Examination of Plaintiff's left hand demonstrated weakness, mild to moderate swelling, and extremely poor grip (Tr. at 182). There was tenderness over the left subacromial bursa and the left AC joint, with tenderness over the distal left forearm into the wrist (Tr. at 182).

Fine motor activity of the hand and finger dexterity was not intact in Plaintiff's left hand (Tr. at 182). Grip strength in her left hand was approximately 3/5 and pinch was approximately 3/5 (Tr. at 182). Plaintiff made a poor fist at 2/5 with her left hand (Tr. at 182). She could neither hold a large object nor pick up and manipulate a coin in her left hand (Tr. at 182). She could, however, write with her left hand using a pen (Tr. at 182). Grasp and handshake were approximately 2/5 in Plaintiff's left hand (Tr. at 182).

Plaintiff was diagnosed with: (1) congestive heart failure; (2) left ventricular hypertrophy; (3) previous myocardial infarction; (4) hypertension, under poor control; (5) ill-defined left arm and chest pain, under study; and (6) morbid obesity (Tr. at 183). Plaintiff's prognosis was

---

[6]A "bursa" is "[a] closed sac or envelope lined with synovial membrane and containing fluid, usually found or formed in areas subject to friction." STEDMAN'S MEDICAL DICTIONARY 252 (26th ed. 1995). The subacromial bursa refers to the bursa "between the acromion and the capsule of the shoulder joint." STEDMAN'S MEDICAL DICTIONARY 253 (26th ed. 1995).

13

"guarded to poor" and her activity potential was markedly reduced (Tr. at 183).

On September 5, 2002, Plaintiff underwent a CT scan of her brain without contrast (Tr. at 198-199). The scan revealed a normal study (Tr. at 198).

Plaintiff was seem by Jill Hallisey, Nurse Practicioner, on September 11, 2002, at Boston University Medical Center (Tr. at 195-197). Hand pain and numbness were the same (Tr. at 195). Current medications included: Furosemide, 40 mg daily; Zestril, 40 mg daily; Aspirin, 325 mg daily; Ferrous Sulfate,[7] 325 mg twice daily; Nitroglycerin; Ibuprofen, 500 mg every six hours as needed; Celebrex,[8] 100 mg twice daily; and Acetaminophen-Codeine,[9] 300-30 mg three times a day as needed (Tr. at 195). Plaintiff was assessed with cardiomyopathy, hypertension, anemia, abnormal lab test - LFTS, depression, glucose intolerance, and wrist pain (Tr. at 196). She was given a prescription for Norvasc,[10] 10 mg daily (Tr. at 196).

On December 21, 2002, Plaintiff was evaluated by John Verstraete, D.O. (Tr. at 206-209). Plaintiff's complaints included "heart attack, left arm" (Tr. at 206). Dr. Verstraete noted:

> The patient has a one year history of high blood pressure. There are associated symptoms of headaches and dizziness. There is no history of cerebrovascular

---

[7]Ferrous Sulfate "is used as a dietary supplement, and to prevent and to treat iron deficiencies and iron deficiency anemia." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03824a1; ylt=AiP9jfy _F4RPVVEY8npyxb8kD7sF.

[8]Celebrex "is in a class of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs). [Celebrex] works by reducing substances that cause inflammation, pain, and fever in the body." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d04380a1;_ylt=AiAqltM.RMSKXbdtadafgnokD7sF.

[9]"Codeine is in a class of drugs called narcotic analgesics. It relieves pain. Acetaminophen is a less potent pain reliever that increases the effects of codeine. Together, acetaminophen and codeine are used to relieve moderate-to-severe pain." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03423a1; _ylt=AvLJfgATh8Xo1xgWnlqu9UQkD7sF.

[10]Norvasc is "used to treat hypertension (high blood pressure) and to treat angina (chest pain)." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00689a1;_ylt=AsF8t3_ioVe.wxWQNahK9mgkD7sF.

accident, nor is there a history of PND or pedal edema to suggest congestive heart failure. The patient is on Norvasc 10 mg daily and Lisinopril 40 mg daily.

The patient reports a six month history of substernal chest pain described as sharp pins with associated shortness of breath precipitated by exertion and emotion. The pain occurs 2-3 times weekly lasting 1-2 minutes. The pain is relieved by rest in ten minutes or by [N]itroglycerin in one minutes [sic]. Echocardiogram has been performed. The patient states she suffered a heart attack in January 2002. There is no history of catheterization. The patient suffered congestive heart failure and showed left ventricular hypertrophy. No further tests have been performed, although old charts do show treadmills may be scheduled in the future. The patient makes use of Lasix 40 mg daily. Nitroglycerin may be used PRN.

PAST MEDICAL HISTORY: Other than above, the patient reports a history of obesity. The patient also reports a history of low back pain that radiates to the legs. It is not aggravated by coughing and sneezing. The patient also complains of bilateral wrist and left knee pain. The patient has no history of orthopedic injury or orthopedic surgery. The patient does not make use of an assistive device. The patient wakes up four times per night due to discomfort. The patient reports morning stiffness for 5-10 minutes and has worsening symptoms with weather changes. Reports that moist heat does not help to alleviate symptoms. The patient makes use of Ibuprofen management.

(Tr. at 206).

Dr. Verstraete's conclusions were as follows:

1.      Hypertension, history of congestive heart failure, status post myocardial infarction

The patient reports a history of the above conditions, currently on two drug management. There is no obvious retinal changes. The cardiac size is poorly evaluated. Echo has revealed left ventricular hypertrophy. Today's blood pressure is poorly controlled. There is no evidence of uncompensated congestive heart failure. The patient reports a history of chest pain. On today's evaluation they occur 2-3 times weekly and are substernal with shortness of breath. They are relieved by rest in ten minutes or [N]itroglycerin in one minute. Echo has been performed. No catheterization or treadmill testing. Historically, the chest pains are suspicious of angina pectoris. No uncompensated congestive heart failure note. Weight loss and risk modification is warranted. Lipid profile is unknown today.

15

2.      Arthralgias[11]

The patient reports a history of low back, bilateral wrist and knee pain.  Today,
there is limited lumbar range of motion bending four inches to the floor.  A left
wrist brace has been used in the past with positive Tinel[12] and Phalen[13] today.
Grip strength is diminished on the left.  Dexterity is preserved.  There is no
inflammatory change.  Limited range of motion of most areas would be assessed
mainly by obesity, although the preserved range of motion noted to the left knee.
There is mild difficulty with orthopedic maneuvers.  Gait is wide based.  Station is
stable.  Again, weight loss is strongly warranted.

(Tr. at 208-209).

On January 31, 2003, Plaintiff began seeking treatment at Truman Medical Center after

moving from Boston to the Kansas City area (Tr. at 242-244, 304-306).  She reported a history of

hypertension after her second pregnancy and had an acute heart attack in January of 2002 (Tr. at

242, 304).  After being hospitalized for her heart attack, Plaintiff had left arm pain and swelling

that started in her wrist and radiated up to her shoulder (Tr. at 242-243, 304-305).  She also

noticed her skin had become more dry and very sensitive to touch, producing pain (Tr. at 243,

305).  Plaintiff stated she experiences chest pain three to four times per week that feels like sharp

needles (Tr. at 243, 305).  She occasionally takes Nitroglycerin, which relieves her pain, but only

when the pain is severe (Tr. at 243, 305).  Plaintiff does not know how long the pain lasts, but

knows it goes away with rest (Tr. at 243, 305).  Plaintiff stated she was not very active around the

house (Tr. at 243, 305).  She does not work and reports climbing the stairs like a child (Tr. at

_____

[11]Arthralgia is "[s]evere pain in a joint, especially one not inflammatory in character."  STEDMAN'S
MEDICAL DICTIONARY 149 (26th ed. 1995).

[12]Tinel's sign is "[a]n examination test that is used by doctors to detect an irritated nerve."  MedicineNet.com,
Definition of Tinel's sign, *at* http://www.medterms.com/script/main/art.asp?articlekey=16687.

[13]"Phalen's Maneuver is a diagnostic test for carpal tunnel syndrome."  Wikipedia, Phalen's maneuver, *at*
http://en.wikipedia.org/wiki/Phalen's_maneuver.

16

243, 305).  Plaintiff is frequently short of breath, especially during activity (Tr. at 243, 305).

Plaintiff also complained of left arm pain and swelling that started after her heart attack (Tr. at 243, 305).  She had a significant work up in Boston that was negative (Tr. at 243, 305).  She was treated with non-steroidal anti-inflammatory drugs and Demerol[14] shots (Tr. at 243, 305).  The pain starts in Plaintiff's wrists and radiates to her shoulder (Tr. at 243, 305).  She is completely unable to use her arm and wears a splint (Tr. at 243, 305).  Her treatment plan included (1) starting Norvasc 5 mg and Lasix[15] 40 mg twice daily; (2) eventual referral to obesity clinic and dietician for weight management and diet issues; (3) request past medical information regarding reflex sympathetic dystrophy[16] versus venous thrombosis,[17] prescription given for Tylenol 3; and (4) get records regarding possible coronary artery disease (Tr. at 243, 305).

Plaintiff had a follow-up appointment at Truman Medical Center on February 14, 2003 (Tr. at 239-241, 301-303).   She reported keeping a low-salt diet with no fried foods and taking her medications as directed (Tr. at 240, 302).  There was no change in left arm pain (Tr. at 240, 302).  Plaintiff complained of headaches, spontaneous nosebleeds and feeling cold all the time (Tr. at 240, 302).  Her treatment plan included increasing Norvasc to 10 mg a day and continuing Lasix and ASA as directed, maintaining her diet and increased activity level, using Tylenol 3 for

---

[14]Demoral "is used to treat moderate-to-severe pain."  Yahoo!Health, Drug Guide, *at* http://health.yahoo. com/drug/d00017a1;_ylt=Aib_GiazSlo.9_Fs6ei8M6IkD7sF.

[15]Lasix is a generic name for Furosemide, *supra* note 2.  Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/ drug/d00070a1;_ylt=Al.5l2ksKJu778NXmZfCRBkkD7sF.

[16]"[D]iffuse persistent pain usually in an extremity often associated with vasomotor disturbances, trophic changes, and limitation or immobility of joints; frequently follows some local injury."  STEDMAN'S MEDICAL DICTIONARY 537 (26th ed. 1995).

[17]"[C]lotting within a blood vessel which may cause infarction of tissues supplied by the vessel."  STEDMAN'S MEDICAL DICTIONARY 1809 (26th ed. 1995).

17

pain, monitoring her thyroid, Capsaicin [18] .075% cream to affected area for reflex sympathetic

dystrophy as well as a neurological consultation and X-ray; and getting records regarding

coronary artery disease (Tr. at 241, 302).  A follow-up appointment was scheduled for three

weeks (Tr. at 241, 303).

On February 25, 2003, Plaintiff's left hand was X-rayed (Tr. at 249, 323).  The

impression was negative, showing no fracture, dislocation, bone erosion, periosteal reaction or

any other acute abnormality (Tr. at 249, 323).  There was no significant joint space narrowing

identified (Tr. at 249, 323).

On March 14, 2003, Plaintiff was seen for a check-up on lab work (Tr. at 226-238, 405-

407).  She stated she had been taking all her medications as directed, but still had pain in her left

arm (Tr. at 237, 406).  She reported experiencing dyspnea[19] with exertion as well as orthopnea[20]

(Tr. at 237, 406).  Plaintiff's treatment plan included (1) adding Toprol to her medication

regimen; (2) starting Zocar;[21] (3) monitoring her potassium; (4) a dietary consult; (5) a neurology

appointment for reflex sympathetic dystrophy; and (6) an echiocardiogram (Tr. at 237, 406).

On March 31, 2003, Plaintiff underwent a neurology consultation at Truman Medical

Center (Tr. at 226, 392-399).  She explained that she had previously had a heart attack; when the

---

[18]Capsaicin cream "is used to relieve minor aches and pains of muscle and joints associated with arthritis, simple backache, strains, and sprains."  Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/ d01321a1;_ylt=Arqbs_pYnYU2H1XYEqoZ.k8kD7sF.

[19]Dyspnea is "[s]hortness of breath."  STEDMAN'S MEDICAL DICTIONARY 535 (26th ed. 1995).

[20]Orthopnea is "[d]iscomfort in breathing which is brought on or aggravated by lying flat."  STEDMAN'S MEDICAL DICTIONARY 1263 (26th ed. 1995).

[21]Zocar "blocks the production of cholesterol (a type of fat) in the body."  Yahoo!Health, Drug Guide, *at* http:// health.yahoo.com/drug/d00746a1;_ylt=AhGIf9FesXXG.dquF7WX.DYkD7sF.

18

heart attack occurred, Plaintiff began to experience left arm weakness and pain (Tr. at 226, 394, 397). She denied having similar symptoms prior to the heart attack, but has occasionally experienced weakness and pain since that time (Tr. at 226, 394, 397). She characterized the pain as "stabbing," as if someone has a knife and was cutting her hand (Tr. at 226, 394, 397). The pain extends toward her shoulder and is not affected by activity (Tr. at 226, 394, 397). Plaintiff has been treated using Motrin, then Tylenol 3, and now Percocet (Tr. at 226). Although the Percocet is helping, it does not completely relieve the pain and makes her very tired (Tr. at 226). There were no objective neurological deficits noted; Plaintiff did have mild swelling at the sight of her wrist brace with possible reflex sympathetic dystrophy (Tr. at 230). The examining physician recommended (1) Plaintiff discontinue narcotics, (2) consider Neurontin[22] - titrate to 1200 mg every night, and (3) an electromyograph/nerve conduction velocity of Plaintiff's left arm for possible entrapment (Tr. at 230). An echocardiogram was also performed, showing; (1) left ventricle dilation with mild left ventricular hypertrophy, there is normal segmental wall motion with left ventricular ejection fraction of 50%; (2) left atrial dilation with mild mitral regurgitation; and (3) mild tricuspid regurgitation with at least mild pulmonary hypertension (Tr. at 232-235, 387-390).

On April 22, 2003, Plaintiff received nutritional education (Tr. at 402-403). The dietician worked with Plaintiff to create a meal plan of approximately 1600 calories per day, with heart healthy guidelines (Tr. at 402).

---

[22]Neurontin "affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. The exact way that it works is unknown." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03182a1;_ylt=AlShWolwsyjN52oVHRTgh.0kD7sF.

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 19 of 53

Plaintiff was examined at Truman Medical Center's Neurodiagnostic Laboratory on May 13, 2003 (Tr. at 324-325). She stated her left wrist and hand pain started in January of 2002, a month after her heart attack (Tr. at 324). She reported wrist swelling, and intermittent numbness in her left third, fourth and fifth digits (Tr. at 324). Other than a mild temperature difference between her hands, Plaintiff's study was normal (Tr. at 325).

On May 22, 2003, Plaintiff had a neurology follow-up visit (Tr. at 316-317). Left wrist and hand pain was her chief complaint (Tr. at 316). Examination did not reveal any focal objective deficits (Tr. at 316). Because her subjective complaints of pain continued, doctors recommended referral to a pain center (Tr. at 316). Plaintiff was also encouraged to lose weight (Tr. at 316).

On June 25, 2003, Plaintiff was seen at Truman Medical Center (Tr. at 383-385). She requested medication refills because she had thrown her old prescriptions away (Tr. at 384). Plaintiff did not appear well during the examination (Tr. at 384). She reported being depressed and having difficulty stopping crying and leaving her house (Tr. 384). Plaintiff was interested in starting an antidepressant and complained of severe pain in her left hand and both feet (Tr. at 384). She was prescribed Zoloft,[23] but was not given a narcotic for her pain (Tr. at 385).

On July 25, 2003, Plaintiff presented to Truman Medical Center as a walk-in patient (Tr. at 381). Examination revealed left hand swelling with an unclear etiology, leg swelling and

---

[23]Zoloft "affects chemicals in the brain that may become unbalanced and cause depression, panic or anxiety, obsessive or compulsive symptoms, or other psychiatric symptoms." Yahoo!Health, Drug Guide, *at* http://health.yahoo. com/drug/d00880a1;_ylt=Akf.2kJ7tMW0xbCxplE1NX4kD7sF.

pruritic[24] pustular lesions (Tr. at 381).   Plaintiff was referred for a rheumatology consultation, given a refill prescription for Tylenol 3, and instructed to continue taking Lasix at the current level (Tr. at 378, 381).

On September 24, 2003, Plaintiff was seen at Truman Medical Center for a follow-up appointment (Tr. at 310-312).  She requested a refill of Tylenol 3 and Zoloft, as she thought both medications were helping (Tr. at 310).  Her affect had improved since starting Zoloft (Tr. at 310).  Plaintiff reported experiencing anxiety attacks and wanted to talk to a counselor for depression (Tr. at 310-311).  She also had two episodes of syncope[25] that led her to the hospital (Tr. at 311).  Plaintiff had trouble walking due to knee pain and could not use her left hand due to pain and swelling (Tr. at 311).  On this same date, Dr. Mullen noted, "Plaintiff is incapable of using left hand and would be unable to do any work that required use of the hand." (Tr. at 261).

On October 6, 2003, Plaintiff had a CT scan of her left hand (Tr. at 314-315).  There was hypertrophy of Lister's tubercle,[26] but the scan was otherwise unremarkable (Tr. at 315).

Plaintiff was first seen at Research Mental Health Services on October 9, 2003 (Tr. at 289-300).  She complained of depression and reported being unhappy at her current residence, as she felt stressed by her nephew (Tr. at 289).   Plaintiff moved to Missouri and in with her sister one year ago (Tr. at 289).  She was separated from her husband of five years and was unsure if

---

[24]"Pruritic" means the lesions were "itchy."  See STEDMAN'S MEDICAL DICTIONARY 1449  (26th ed. 1995).

[25]Syncope is the "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow." STEDMAN'S MEDICAL DICTIONARY 1720 (26th ed. 1995).

[26]Lister's tubercle is "a small prominence on the dorsal aspect of the distal end of the radius lateral to the groove for the extensor pollicis longus tendon; it serves as a trochlea or pulley for the tendon."   STEDMAN'S MEDICAL DICTIONARY 1866, 1865 (26th ed. 1995).

she wanted to return to North Carolina to live with him (Tr. at 289). She felt isolated and like she had few friends (Tr. at 189). Plaintiff stated she was not happy about her ongoing health problems and inability to work (Tr. at 289). She reported having problems with left-side pain and weakness, but that doctors have not been able to diagnose it (Tr. at 289). During the appointment, Plaintiff rated her pain as six on a scale of one to ten (Tr. at 290).

Plaintiff's symptoms included decreased sleep (three to four hours a night), fatigue, isolation, anxiety, crying spells, and paranoia (Tr. at 290). Her current medications included Acetaminophen with Codeine, 40 mg Furosemide, 10 mg Amlodipine,[27] 5 mg Troprol XL, 40 mg Simvastatin,[28] and 50 mg Sertraline[29] (Tr. at 296). She stated she had a decreased capacity for activities of daily living due to her physical health concerns (Tr. at 290). Plaintiff was diagnosed with major depression, moderate single episode, and generalized anxiety disorder (Tr. at 295). She was referred to psychiatry for medication management and to psychotherapy to work on improving her coping skills (Tr. at 295).

On October 16, 2003, Plaintiff saw a counselor at Research Mental Health Services (Tr. at 286). She reported having pain of an unknown origin for two years and depression concerning her heath concerns (Tr. at 286). Plaintiff was tearful and had a GAF of 55[30] (Tr. at 286).

---

[27]Amoldipine "is used to treat hypertension (high blood pressure) and to treat angina (chest pain)." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00689a1;_ylt=AjxMp4p35TbY7JZ4MNrXLrMkD7sF.

[28]"Simvastatin" is the generic name for Zocar, *supra* note 21. Yahoo!Health, Drug Guide, *at* http://health. yahoo.com/drug/d00746a1;_ylt=Aq88pa3bmduS.jOohLAG.SgkD7sF.

[29]"Sertraline" is the generic name for Zoloft, *supra* note 23. Yahoo!Health, Drug Guide, *at* http://health.yahoo. com/drug/d00880a1;_ylt=AnN8Rt0sgWt7TZmyPlfeLl8kD7sF.

[30]The GAF is a 100-point tool rating overall psychological, social and occupational functioning of people over 18 years of age and older. It excludes physical and environmental impairment. A score ranging from 51 to 60 indicates moderate symptoms or "moderate difficulty in one of the following: social, occupational, or school functioning." Barbara

Plaintiff saw a Research Mental Health Services counselor on October 27, 2003 (Tr. at 285). She did not feel like she was getting any benefit from 50 mg of Zoloft and reported being in a sad mood (Tr. at 285). She also stated she struggled with daily pain (Tr. at 285).

On September 30, 2003, Plaintiff had an echocardiogram (Tr. at 374-376). The test revealed (1) mild concentric left ventricular hypertrophy with preserved left ventricle function and wall motion; (2) mild left atrial enlargement with trace mitral regurgitation; (3) trace tricuspid regurgitation and mild pulmonic insufficiency with normal pulmonary artery pressure; and (4) mild aortic valve sclerosis without stenosis (Tr. at 375).

On November 3, 2003, Plaintiff was seen by Dr. DeMarco in rheumatology after referral by the internal medicine clinic due to persistent pain in her left hand (Tr. at 369-373). She stated her pain started approximately one year ago without trauma and that she has had recurrent pain and some swelling in her left wrist and hand since that time (Tr. at 372). She reported her pain was aggravated by intravenous treatments that she received when hospitalized for a possible heart attack (Tr. at 372). She was taking Tylenol 3 for pain (Tr. at 372). Examination revealed tenderness over the dorsum of her wrist, but without evidence of swelling (Tr. at 373). Plaintiff was diagnosed with (1) left wrist pain, soft tissue without apparent cause; (2) morbid obesity; (3) hypercholesterolemia, on treatment; (4) hypertension, on medication; and (5) depression, on medication (Tr. at 373).

On November 4, 2003, Plaintiff underwent a psychiatric evaluation at Research Mental Health Services (Tr. at 281-284). Plaintiff reported signs and symptoms of depression for the

L. Brown, Global Assessment of Functioning (GAF) Scale (DSM - IV Axis V), *at* http://www.gpc.edu/~bbrown/psyc2621/ch3/gaf.htm.

23

past year (Tr. at 281). She experienced sadness, crying frequently, initial and terminal insomnia, fatigue, some irritability and suicidal ideation that occurred one time per week (Tr. at 281). Plaintiff had been on Zoloft 50 mg for the past three months and saw a small change (Tr. at 281-282). Edna Hamera, psychiatric nurse practicioner, noted Plaintiff's two-year-old son accompanied her to the interview; her son was very well behaved and Plaintiff demonstrated exceptional parenting skills (Tr. at 283).

Plaintiff had little eye contact and became teary several times during the interview (Tr. at 283). Her affect was restricted and she reported occasional suicidal ideation but with no specific plan (Tr. at 283). Plaintiff was articulate and denied thought disorders; there was no evidence that she was unable to follow or convey her thinking clearly (Tr. at 283). She did report occasionally hearing people call her name when no one was there (Tr. at 283). Plaintiff reported few problems with concentration and was oriented (Tr. at 283).

Nurse Practicioner Hamera diagnosed Plaintiff with major depressive disorder, single episode, moderate (Tr. at 283). Plaintiff's stressors included problems with an inadequate living situation, financial issues, and primary support (Tr. at 284). Her GAF was assessed at 50[31] (Tr. at 284). Nurse Practicioner Hamera increased Plaintiff's Zoloft dosage to 100 mg and prescribed Trazodone[32] 50 mg to help her sleep (Tr. at 284).

Plaintiff saw a counselor on November 17, 2003, and reported sleeping somewhat better

---

[31] A GAF score ranging from 41 to 50 indicates serious symptoms or "serious impairment in one of the following: social, occupational, or school functioning." Barbara L. Brown, Global Assessment of Functioning (GAF) Scale (DSM - IV Axis V), at http://www.gpc.edu/ ~bbrown/psyc2621/ch3/gaf.htm.

[32] Trazodone is an antidepressant. Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00395a1;_ylt= At1SdQo3UeH9.pmYhhoyZVokD7sF.

(Tr. at 279). She had not experienced any side effects from the medication and wished to continue her regimen (Tr. at 279). Plaintiff was in a "sad mood" and had a GAF of 55 (Tr. at 279).

Plaintiff saw Nurse Practicioner Hamera for a follow-up appointment on December 23, 2003 (Tr. at 277). She reported sleeping better with the Trazodone, and estimated taking it five nights per week (Tr. at 277). She stated she was concerned that when her kids were sick she could not wake up to give them medicine and did not take the medication on those nights (Tr. at 277). Plaintiff reported some improvement in mood with the increase in Zoloft (Tr. at 277). She became tearful during the interview (Tr. at 277). Plaintiff still has some depression and reported it was common for her during the holidays (Tr. at 277). She has occasional suicidal ideations, but such ideations are momentary and she has no plan (Tr. at 277). Plaintiff did not want to increase her dosage of Zoloft, but would consider doing so when she returned in February (Tr. at 277). Nurse Practicioner Hamera stated it was difficult to distinguish whether her depressive symptoms were attributable to her remaining depression or to the holidays (Tr. at 277).

On January 27, 2004, Plaintiff was diagnosed with patella-femoral syndrome[33] (Tr. at 364). Her doctor ordered four to six weeks of physical therapy, two to three times each week (Tr. at 364). She described her knee as "swollen and sore" and rated the pain around her patella at seven out of ten (Tr. at 365). Plaintiff's pain was intermittent and relieved by propping up her knee or sitting with her leg straight (Tr. at 365). On examination, Plaintiff's left lateral

---

[33]Chronic knee pain. See MedicineNet.com, Chondromalacia Patella (Patellofemoral Syndrome), *at* http://www.medicinenet.com/patellofemoral_syndrome/article.htm.

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 25 of 53

mallelous[34] was hypersensitive to light touch (Tr. at 265).  She described her pain as excruciating (Tr. at 365).

Nurse Practicioner Hamera returned a telephone call from Plaintiff on February 3, 2004 (Tr. at 276).  During the call, Plaintiff related that living with her sister was "intolerable" and that she was looking for another place (Tr. at 276).  She had thought about just taking off in a car with her children to another place, but agreed that doing so may not be a solution (Tr. at 276).  Plaintiff denied suicidal ideation (Tr. at 276).

On February 4, 2004, Plaintiff began a round of physical therapy and was seen five times (Tr. at 363).  On February 9, 2004, she rated her pain as five on a ten-point scale in the left letcrel patella before doing exercises, and as a four afterwards (Tr. at 363).  Plaintiff rated her pain as five out of ten on February 11, 2004, and her symptoms increased with exercise (Tr. at 363).  On February 17, 2004, the pain in Plaintiff's left knee was an eight, but decreased to a six after treatment (Tr. at 363). On February 22, 2004, Plaintiff assessed her pain as a five on a ten-point scale and stated it was aggravated by stairs and walking (Tr. at 354).  Plaintiff experienced severe tenderness over her patella-crepitus with only slight pressure; she had good tolerance to gentle exercise (Tr. at 354).  On February 24, 2004, the pain in Plaintiff's left patellofemoral joint was ten out of ten (Tr. at 363).  She was unable to finish her exercises due to increased pain and her emotional condition (Tr. at 363).

On February 28, 2004, Plaintiff was prescribed one session of physical therapy to undergo an assistive device evaluation (Tr. at 351).  Plaintiff completed a Lysholm Knee Rating System

---

[34]"[T]he process at the lateral side of the lower end of the fibula, forming the projection of the lateral part of the ankle."  STEDMAN'S MEDICAL DICTIONARY 1057 (26th ed. 1995).

(Tr. at 350). She reported a slight or periodic limp, that weight bearing was impossible, a locking sensation in her knee that did not cause it to ultimately lock, occasional instability during daily activities, constant pain and swelling, a slight problem with stairs, and inability to squat beyond 90° (Tr. at 350). On evaluation, Plaintiff assessed the pain in her left patellofemoral joint as a ten on a ten-point scale (Tr. at 352). Her pain was constant and aggravated by bending down; resting relieved her pain (Tr. at 352). She was hypersensitive to palpation on her left patellofemoral joint and left lateral mellelens and her left foot was swollen (Tr. at 352).

On February 17, 2004, Plaintiff had an appointment with Nurse Practicioner Hamera (Tr. at 272). Plaintiff reported that she was living back at her sister's home with continued conflict (Tr. at 272). She said her sister accused her of trying to poison her (Tr. at 272). She stated she had not been taking her blood pressure medication because she had run out (Tr. at 272). During the appointment, Nurse Practicioner Hamera observed Plaintiff to be articulate, somewhat angry in tone, with only intermittent eye contact (Tr. at 272). Plaintiff's three-year-old son was with her and she displayed good parenting skills (Tr. at 272). She denied suicidal ideation (Tr. at 272). Plaintiff's affect was restricted, and her mood was still somewhat depressed (Tr. at 272). Assessment included recurrent depression; Plaintiff was continued on Zoloft 100 mg every morning and Trazodone 50 mg every night (Tr. at 272).

On April 30, 2004, Plaintiff was prescribed physical therapy two to three times a week for one month (Tr. at 346). On May 6, 2004, she was seen for an initial evaluation for physical therapy at Truman Medical Center for ankle pain (Tr. at 326). Plaintiff complained of increased pain with walking and standing and was beginning to drag her left foot (Tr. at 332). She rated her pain level at six on a ten-point scale (Tr. at 332). Plaintiff's pain was aggravated by bending

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 27 of 53

and walking and was relieved by "nothing" (Tr. at 332). During the evaluation, she reported difficulty walking and said she was unable to walk more than two blocks (Tr. at 332). In response to a Lysholm Knee Rating System, Plaintiff reported a slight or periodic limp, the need for a cane or crutch, occasional knee locking, occasional instability during daily activities, intermittent and light pain during strenuous activities, constant swelling, the ability to take stairs one at a time, and inability to squat being 90° (Tr. at 334). On an ankle rating system, she reported a slight or periodic limp, the need for a cane or crutch, occasional instability during daily activities, marked pain during or after walking more than 1.2 miles, constant swelling, and ability to take stairs one at a time (Tr. at 335). Plaintiff attended three physical therapy sessions, but was discharged on June 3, 2004, for failure to attend her sessions (Tr. at 326).

Plaintiff did not attend her July 6, 2004, appointment with Nurse Practicioner Hamera (Tr. at 270).

On July 13, 2004, Plaintiff saw Nurse Practicioner Hamera (Tr. at 269). She reported doing okay with the medication and was sleeping better (Tr. at 269). Plaintiff reported getting therapy for her knee and said she had been walking up to one mile a day until it became very hot (Tr. at 269). Nurse Practicioner Hamera noted Plaintiff appeared euthymic, although distressed with the hot temperature and needing to bring her two small children with her (Tr. at 269). She did not have any suicidal ideations; affect was within normal range (Tr. at 269). Assessment included depression, with a GAF of 55-60 (Tr. at 269). She was instructed to continue taking Zoloft 100 mg every morning, Trazodone 500 mg every night, and to return in six months (Tr. at 269).

On September 28, 2004, Plaintiff had an appointment with Nurse Practicioner Hamera

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 28 of 53

(Tr. at 415). She reported isolating herself for the past month and discontinuing both her psychiatric medications and the medications she received from her primary care physician (Tr. at 415). Plaintiff was teary during the interview and maintained limited eye contact (Tr. at 415). She had suicidal ideation, and stated she thinks of cutting her wrists but goes on a walk with her neighbor to avoid doing so (Tr. at 415). During the appointment, Plaintiff agreed to take her medications and said she would advise Nurse Practicioner Hamera if she stopped (Tr. at 415).

Plaintiff had a follow-up appointment at Truman Medical Center for her left-sided pain on October 1, 2004 (Tr. at 439-441). She said she had been seen by an orthopaedic surgeon and has had "every test you can do" for her pain, with no result (Tr. at 440). She has been taking Tylenol extra strength and Tylenol 3 for her pain with minimal relief (Tr. at 440). Plaintiff has been diagnosed with patellofemoral syndrome and placed on Naprosyn 500 twice daily, which she was no longer taking (Tr. at 440). She reported intermittent chest pain with shortness of breach and diaphoresis[35] worsening over the past three weeks and described the pain as similar to the pain she felt with her heart attack (Tr. at 440). The chest pain occurred both at rest and with exertion and went away again with rest (Tr. at 440). She said she was shopping with a friend yesterday and had a particularly severe episode (Tr. at 440). Plaintiff was referred to cardiology for a stress test, to neurology for a follow-up appointment, and continued on her medications (Tr. at 441). Dr. Mullen later added an addendum noting that Plaintiff's chest pain did not sound cardiac in nature (Tr. at 441).

On October 10, 2004, Plaintiff met with Nurse Practicioner Hamera and reported that she still got aggravated and depressed (Tr. at 411). She told her that she does not take her

---

[35]Perspiration. STEDMAN'S MEDICAL DICTIONARY 475 (26th ed. 1995).

medications approximately two days out of the week; she does so when very depressed and thinking "why keep on?" (Tr. at 411). Plaintiff reported occasional suicidal ideation (Tr. at 411). Her GAF was 55 (Tr. at 411).

Plaintiff saw Nurse Practicioner Hamera again on October 12, 2004 (Tr. at 414). She indicated she was having problems sleeping and woke every hour (Tr. at 414). Her physician told her to stop taking the Trazodone and asked her to cut back on Tylenol 3 until he ran a test on October 25, 2004 (Tr. at 414). Plaintiff reported getting angry and upset a lot due to her living situation, as her sister is not happy having Plaintiff and her children there (Tr. at 414). Nurse Practicioner Hamera noted Plaintiff was teary during the appointment and reported some suicidal ideation recurrence (Tr. at 414). Plaintiff stated she sometimes thinks about driving and having a car accident, but is able to refrain (Tr. at 414). Her affect was restricted and she appeared sad; she did not have any psychotic thinking (Tr. at 414). Plaintiff was given 1 mg Clonazepam to help her sleep at night (Tr. at 414). She was continued on Zoloft 100 mg and started taking Lamictal[36] 50 mg (Tr. at 414).

Plaintiff had a follow-up appointment for her left-sided pain on October 15, 2004 (Tr. at 430-432). She reported continued pain that was not controlled by Tylenol (Tr. at 431). She became "worked up" during the interview as she explained her pain and expressed a lack of desire to live (Tr. at 431). Plaintiff stated she was unwilling and unable to exercise due to her depression (Tr. at 431). She continued to have intermittent sharp chest pain and continuous shortness of breath (Tr. at 431).

_____

[36]"The exact way that [Lamictal] works is unknown. However, it is believed that [Lamictal] affects chemicals in the brain involved in seizures and in bipolar disorder." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03809a1;_ylt=AklzSmN0QDGax__cTbPZktwkD7sF.

30

On October 25, 2004, Plaintiff underwent a stress test (Tr. at 433). The test showed (1) no ECG evidence of ischemia, (2) ejection fraction of 54% with apical akinesis, (3) moderate-sized mid to distal anterolateral wall defect with moderate reversibility and a fixed apical wall defect (Tr. at 433-434). The estimated sum stress score was eight, which was mildly abnormal (Tr. at 434). Plaintiff was continued on aggressive risk factor modification and would be considered for revascularization if failure occured after maximal medical therapy (Tr. at 434).

On November 3, 2004, Plaintiff requested pain medication for her arm and was given Tylenol 3 (Tr. at 426).

Plaintiff met with Nurse Practicioner Hamera on November 23, 2004 (Tr. at 409). She reported that she stopped her medication one week ago after her sister told her she wanted her out of her home by the first of the month (Tr. at 409). She stated she "doesn't care anymore" (Tr. at 409). Although she denied any active suicidal tendencies, Plaintiff stated she hoped she would just have another heart attack and die (Tr. at 409). Nurse Practicioner Hamera observed Plaintiff appeared depressed and had a flat affect; her GAF was 55 (Tr. at 409). She noted Plaintiff may be contemplating "passive suicide" by not taking her medications (Tr. at 409). Plaintiff was restarted on Lamictal (Tr. at 409-410).

Plaintiff was seen at Truman Medical Center on December 10, 2004, for a follow-up appointment regarding her hypertension, left extremity pain, hypercholesterolemia, obesity, and dyspnea (Tr. at 422-424). She complained of chronic pain in her left wrist, knee and ankle; the pain was sharp and shooting to the touch (Tr. at 423). She stated the pain has been there for three years and neither Tylenol nor Tylenol 3 alleviated the pain (Tr. at 423). Tylenol 3 also made her tired (Tr. at 423). Plaintiff seemed agitated during the appointment, and said she "doesn't care"

about her health (Tr. at 423). Her mood was apathetic and depressed (Tr. at 423).

On December 21, 2004, Plaintiff had an appointment with Nurse Practicioner Hamera
(Tr. at 419). She reported sleeping well and said her mood was good (Tr. at 419). Although her
affect was still restricted, she was more animated (Tr. at 419). Nurse Practicioner Hamera noted
Plaintiff was very appropriate with her children and used good problem-solving abilities (Tr. at
419). Her GAF was 50 (Tr. at 419).

Nurse Practicioner Hamera completed a Medical Source Statement on February 22,
2005 (Tr. at 443-446). According to the statement, Nurse Practicioner Hamera saw Plaintiff
every two to three months (Tr. at 443). Plaintiff had been diagnosed under Axis I with major
depression, moderate (Tr. at 443). She had been complaint with Nurse Practicioner Hamera's
treatment recommendation and had a "good' prognosis if stressors were relieved (Tr. at 443).
Plaintiff was not significantly limited in her ability to remember locations and work-like
procedures, understand and remember very short and simple instructions, understand and
remember detailed instructions, carry out very short and simple instructions, perform activities
within a schedule/maintain regular attendance and be punctual within customary tolerances,
sustain an ordinary routine without special supervisions, make simple work-related decisions,
interact appropriately with the general public, ask simple questions or request assistance, get
along with co-workers or peers without distracting them or exhibiting behavioral extremes,
maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness,
respond appropriately to changes in the work setting, be aware of normal hazards and take the
appropriate precautions, and to set realistic goals or make plans independently of others (Tr. at
444-446). She was moderately limited in her ability to carry out detailed instructions, maintain

attention and concentration for extended periods of time, complete a normal work-day and work-week without interruptions from psychologically-based symptoms/perform at a consistent pace without an unreasonable number and length of rest periods, and to accept instructions and respond appropriately to criticism from supervisors (Tr. at 444-445).

## B. RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT

On July 24, 2002, Dr. Joanne Jones performed a Physical Residual Functional Capacity Assessment (Tr. at 185-192). She found that: Plaintiff could lift or carry up to twenty pounds occasionally and ten pounds frequently; she could stand or walk with normal breaks for a total of about six hours in an eight-hour workday; she could sit with normal breaks for a total of about six hours in an eight-hour workday; and her ability to push and pull was unlimited (Tr. at 186). These conclusions were based upon Plaintiff being markedly obese with chest pain, her self-reported history of angina,[37] congestive heart failure, a heart attack, left chest wall and arm pain, a limited range of motion of her left arm at the shoulder, and decreased grip and swelling in her left hand (Tr. at 186-187).

Plaintiff did not have any postural, visual, communicative, or environmental limitations (Tr. at 187, 188, 189). Dr. Jones stated Plaintiff had a "fairly full range of daily activities" and noted she "cooks, cleans, shops, cares for her children and does her personal grooming" (Tr. at 187). Dr. Jones opined that, based on these limitations, Plaintiff should be able to do light work (Tr. at 187).

Plaintiff was limited in reaching all directions, handling, and fingering but was unlimited in feeling (Tr. at 188). However, Dr. Jones noted Plaintiff was occasionally limited in handling,

---

[37]"A severe, often constricting pain." STEDMAN'S MEDICAL DICTIONARY 83 (26th ed. 1995).

33

fingering and working above shoulder-level on the left (Tr. at 188).

On January 28, 2003, Wayne Williamson, D.O., performed a Physical Residual Functional Capacity Assessment (Tr. at 210-219). He found Plaintiff could: lift or carry up to twenty pounds occasionally and ten pounds frequently; stand or walk with normal breaks for a total of about six hours in an eight-hour workday; sit with normal breaks for a total of about six hours in an eight-hour workday (Tr. at 211). Plaintiff's ability to push and pull was unlimited (Tr. at 186). Plaintiff was occasionally limited in climbing ramps or stairs, balancing, stooping, kneeling, crouching and crawling (Tr. at 212). She was also occasionally limited in reaching all directions, handling and fingering, but was unlimited in feeling (Tr. at 213). Plaintiff did not have any visual or communicative limitations (Tr. at 213-214). Due to her heart attack, Dr. Williamson found Plaintiff should avoid concentrated exposure to extreme heat and cold (Tr. at 214).

Dr. Williamson further found that the severity and duration of Plaintiff's symptoms were disproportionate to the expected severity and expected duration based on her medically determinable impairments (Tr. at 215). He stated:

> [Plaintiff's] allegations are partially credible. She does have a history of [a heart attack] and was treated for [congestive heart failure] in the past; however, at the present time she is stable. There is no evidence of any heart failure at the present time. There was no edema present. Hypertension is not under good control but better than in 7/02. According to a recent exam there is no evidence of fundal abnormalities but back in July, it was noted by Dr. Bochman that there was moderate arteriolar narrowing bilaterally. [Plaintiff] may have some early retinopathy secondary to her hypertension. [Plaintiff's] biggest problem is probably her morbid obesity but she had a pretty good exam other than for slow wide-based gait. Does not seem to have significant problems with her obesity but obviously some problems.
>
> [Activities of daily living] show that she can care for her personal needs without

34

difficulty. Her sister cooks and does the laundry but she can cook things that are easy and needs help opening cans and lifting pots and pans. She can do laundry, needing help taking the clothes out of the machines. States she doesn't do any household chores. Shops for groceries 2 ½ hours, once a month, needs help with lifting. Sometimes drives and is able to leave home without assistance. Her hobby is skating. [Activities of daily living] seem decreased out of proportion to the medical findings.

There is no treating or referring medical opinion noted in the record. With the above statements and totality of evidence in file and noting that she may have left carpal tunnel syndrome, [Plaintiff] should be capable of performing the enclosed [Residual Functional Capacity].

(Tr. at 219).

On May 16, 2003, Plaintiff underwent a third physical residual functional capacity assessment (Tr. at 250-258). Beth Jones, M.D., found that: Plaintiff could lift or carry up to twenty pounds occasionally and ten pounds frequently; she could stand or walk with normal breaks for a total of about six hours in an eight-hour workday; she could sit with normal breaks for a total of about six hours in an eight-hour workday; and her ability to push and pull was limited in the upper extremities (Tr. at 251). Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she could never climb a ladder, rope or scaffold (Tr. at 252). Plaintiff was also limited in reaching all directions, handling, fingering, and feeling (Tr. at 253). She did not have any visual or communicative limitations (Tr. at 253-254). Plaintiff's only environmental limitation was the need to avoid concentrated exposure to hazards such as machinery and heights (Tr. at 254). Dr. Jones noted Plaintiff was obese, but that there was no other reason for her shortness of breath than deconditioning (Tr. at 255). She described Plaintiff as not fully credible (Tr. at 255). However, Dr. Jones did find Plaintiff's complaints of constant arm pain to be credible (Tr. at 255). She noted, "I do think that despite the diagnosis confusion

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 35 of 53

of [Plaintiff's] left arm, there are a lot of objective findings present to support objective function loss" and ultimately recommended an "one-armed light residual functional capacity" (Tr. at 258).

### C. SUMMARY OF TESTIMONY

During the hearing, Plaintiff testified; Amy Salva, a vocational expert, also testified at the request of the ALJ.

**1. Plaintiff's testimony**

Plaintiff was forty-four years old at the time of the hearing, having been born on April 19, 1960 (Tr. at 29). She and her children live with her sister (Tr. at 29). Plaintiff claimed that she had been disabled since January of 2002, at which time she had a heart attack (Tr. at 29). She has not performed any work since that time (Tr. at 30). Before suffering a heart attack, Plaintiff worked as a certified nurse's assistant (Tr. at 30, 40). Previous employment also includes that of an assistant manager at a gas station and as a customer service representative (Tr. at 30, 40). In customer service, Plaintiff was required to talk on the phone, address people's concerns at the store, and slice meats; she classified this job as being the easiest from a physical standpoint (Tr. at 40). If it were not in a closed-in area, Plaintiff believes she could currently perform this job (Tr. at 40-41).

Plaintiff testified that she had never had heart surgery (Tr. at 31); the only surgery she has ever undergone was a C-section with the birth of her child (Tr. at 31). Plaintiff's medical records do not reveal a source for her pain; all of the objective tests have come back negative (Tr. at 42). Doctors have told her that they do not know what causes her hand, knee and feet to swell (Tr. at 42). Plaintiff's physical therapist told her to exercise her leg and to walk (Tr. at 42).

Plaintiff's current medications included Norvasc, Furosemide, and Toprol (Tr. at 31).

She stated she was unable to work due to difficulty with pain and because her medication makes her tired (Tr. at 38). The medication also makes her nauseated, causing her to throw up once in awhile (Tr. at 38-39). Doctors have told her to continue taking the medication and that she should allow two to three months for the medicine to get into her system (Tr. at 39). Plaintiff was unsure whether she could work for eight hours a day, five days a week due to her physical problems and medication (Tr. at 41-42). Plaintiff classified her depression as being a secondary concern to her physical problems (Tr. at 41).

Plaintiff stated that she can stand for approximately one hour before needing to sit down due to difficulty with balance (Tr. at 31-32). Plaintiff walks with a cane because she is very unsteady on her feet (Tr. at 32). This unsteadiness, as well as the pain in her left knee and ankles, prevents her from walking further than one block (Tr. at 32). Plaintiff stated she had her left knee X-rayed in 2003, but did not know what the film showed (Tr. at 32-33). Neither the ALJ nor Plaintiff's attorney could not find the X-ray in the record (Tr. at 40).

Plaintiff testified she could lift approximately ten to fifteen pounds before she felt pain in her left arm (Tr. at 33). Plaintiff is left-handed, and is able to hold and write with a pen (Tr. at 33). She testified she had "a lot of pain in [her] back" (Tr. at 34). Sitting bothers Plaintiff's back (Tr. at 34). Plaintiff moves around when she sits, so it becomes very uncomfortable; there is no limit on how long she can sit before needing to stand (Tr. at 34). Plaintiff cannot bend over without getting dizzy due to her medication (Tr. at 34). She can climb steps (Tr. at 34).

Plaintiff does not have any hearing problems (Tr. at 34). Although she wears eyeglasses, she can see without them (Tr. at 34). Plaintiff does not smoke; she only has trouble breathing when she walks long distances and becomes short of breath (Tr. at 34-35). Plaintiff stopped

using an inhaler, on her own initiative, because she did not feel like it was helping (Tr. at 35).

Plaintiff sometimes has difficulty thinking when she does not understanding something, but this

does not happen very often (Tr. at 35). She did not have other difficulties or weaknesses in any

other part of her body (Tr. at 35).

Plaintiff stated she typically got up at 5:00 a.m. and spends the morning getting her

seven-year-old daughter ready for school (Tr. at 35, 36). After taking her daughter to the bus

stop at 8:00, Plaintiff spends the rest of the day caring for her three-year-old son (Tr. at 35, 36).

Plaintiff reads books to her son, watches him ride his bike outside, and feeds him (Tr. at 36). At

approximately 3:30 p.m., Plaintiff meets her daughter at the bus stop, unless the bus driver drops

her off at the front door (Tr. at 36-37). Plaintiff then helps her daughter with her homework.

Plaintiff's sister cooks dinner, but Plaintiff helps clean, vacuum, and do the dishes (Tr. at 37).

Plaintiff is able to run errands (Tr. at 37). She goes to some, but not all, of her daughter's

school activities (Tr. at 37). She does not have any other activities during the day (Tr. at 37).

Plaintiff socializes with her sister when she is home, and also spends time socializing with

neighbors (Tr. at 38). Plaintiff does not exercise and doctors have told her she needs to increase

her walking (Tr. at 39). She testified that she walks to and from the bus stop, but not as much as

she should (Tr. at 39).

## 2.    Vocational expert testimony

Vocational expert Amy Salva testified at the request of the Administrative Law Judge.

Ms. Salva stated that Plaintiff's past relevant work was that of (1) a certified nurse assistant,

which is a medium semi-skilled position, (2) a retail manager, which is a light skilled position,

and (3) a customer service clerk, which is a light semi-skilled position (Tr. at 45). She further

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 38 of 53

stated that positions exist in the United States and Missouri where a customer service clerk can perform at a sedentary level (Tr. at 45-46). Ms. Salva explained that Plaintiff's past work as a customer service clerk would be classified as "light" because she sliced meat as a part of her job duties (Tr. at 45). The ALJ then asked whether Plaintiff could perform past relevant work, or other work, under the following hypotheticals.

The ALJ first hypothesized an individual of Plaintiff's age, education and work history (Tr. at 45). The hypothetical assumed that the individual had a residual functional capacity to stand two hours a day, could sit for six to eight hours a day, lift ten pounds occasionally and five pounds frequently, perform only simple tasks, and work with the public (Tr. at 46-47). Ms. Salva testified that such an individual could not perform Plaintiff's past relevant work (Tr. at 47). The individual could, however, perform sedentary, unskilled positions such as a surveillance systems monitor, an assembly position, a wire wrapper, or production assembly positions such as an optical goods assembler or a photo finisher (Tr. at 47). Approximately 2,000 positions exist in the State of Missouri for a surveillance systems monitor, and 250,000 exist nationally (Tr. at 47). About 1,300 wire wrapper positions exist in the State of Missouri, and approximately 60,000 exist nationally. The State of Missouri has approximately 300 optical goods assembly positions, whereas approximately 15,000 exist nationally. Finally, about 500 photo finisher positions exist in Missouri, with 35,000 existing nationally (Tr. at 47).

Ms. Salva testified that Plaintiff's past work as a retail manager and customer service clerk both required more standing than sitting (Tr. at 48). Neither one of these positions required lifting more than twenty pounds (Tr. at 48).

## D. FINDINGS OF THE ALJ

On March 8, 2005, the ALJ issued an opinion finding that Plaintiff was not disabled at step four of the sequential analysis. The ALJ found at step one that Plaintiff had not worked since her alleged onset of disability (Tr. at 22). At step two, the ALJ found that Plaintiff had a number of severe impairments including: mild left ventricular hypertrophy; mild left atrial enlargement with preserved heart function and wall motion; hypertension, now controlled; arthralgias; obesity; and depression (Tr. at 16, 22). However, she found at step three that the impairments did not "meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4" (Tr. at 22). At step four, the ALJ found Plaintiff's impairments did not prevent her from performing past relevant work (Tr. at 22).[38]

## V. HYPOTHETICAL QUESTIONS TO THE VOCATIONAL EXPERT

Plaintiff argues that the ALJ erred in finding that she had arthralgia but by failing to include manipulative limitations in the hypotheticals posed to the vocational expert. A hypothetical question is proper if it "sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). "The hypothetical question must capture the concrete consequences of the claimant's

---

[38]The ALJ erroneously found that Plaintiff's impairments did not prevent her from performing past relevant work, as the vocational expert testified that an individual of Plaintiff's age, education, and work history who had a residual functional capacity to stand two hours a day, sit for six to eight hours a day, lift ten pounds occasionally and five pounds frequently, perform only simple tasks, and work with the public could not perform Plaintiff's past work (Tr. at 47). Under the sequential evaluation process, the burden of persuasion then shifted to the Commissioner to establish other types of substantial gainful activity exist in the national economy that Plaintiff can perform. See Wilcutts, 143 F.3d at 1137; Griffon, 856 F.2d at 1153-54; McMillian, 697 F.2d at 220-21. Based on the hypothetical questions posed, the Commissioner satisfied this burden when the vocational expert testified such individual could perform sedentary, unskilled positions such as a surveillance systems monitor, an assembly position, a wire wrapper, or production assembly positions such as a optical goods assembler or a photo finisher - - all of which exist within the State of Missouri and nationally (Tr. at 47). As will be discussed in Section V, however, the ALJ's questions were improper as they did not encompass Plaintiff's manipulative limitations.

deficiencies." Id. However, "the ALJ may exclude any alleged impairment that she has properly rejected as untrue or unsubstantiated." Id.

In this case, the ALJ found Plaintiff had the following impairments: mild left ventricular hypertrophy, mild left atrial enlargement with preserved heart function and wall motion, hypertension, arthralgias, obesity, and depression (Tr. at 16, 22). Based on these impairments, the ALJ included the following limitations in her hypothetical questions: the ability to stand two hours a day; the ability to sit six to eight hours a day; the ability to lift ten pounds occasionally and five pounds frequently; the ability to carry out only simple tasks; and the lack of ability to work with the public (Tr. at 46-47). Plaintiff now argues the record contains substantial evidence that Plaintiff's arthralgias resulted in a reduced range of motion, joint pain, and/or swelling in Plaintiff's left hand and that the ALJ should have, accordingly, including a manipulative limitation the hypothetical questions posed to the vocational expert.

I agree that the ALJ's decision not to include manipulative limitations in her hypothetical questions was not supported by substantial evidence of the entire record. In deciding to exclude manipulative limitations, the ALJ appears to have relied on (1) Dr. Verstrate's December 21, 2002, finding that the dexterity in Plaintiff's left hand was preserved, that there was no muscle wasting or swelling, and that range of motion of the wrists were equal bilaterally (Tr. at 19, 207) and (2) the negative objective test results (i.e., normal X-rays, negative CT scans, no objective neurological deficits) (Tr. at 19, 200, 230, 249, 314-315, 316, 323, 324-325).

Despite this evidence, the record is replete with evidence that Plaintiff's arthralgias did result in manipulative limitations. Plaintiff is left-handed (Tr. at 33). On July 20, 2002, Dr. Bochman examined Plaintiff and found flexion of her left forearm was limited to approximately

41

45 degrees and flexion of the left wrist was markedly limited due to pain and mild swelling  (Tr. at 182).  Examination of Plaintiff's left hand demonstrated weakness, mild to moderate swelling, and extremely poor grip (Tr. at 182).  Dr. Bochman noted that fine motor activity of the hand and finger dexterity was not intact in Plaintiff's left hand (Tr. at 182).  Grip strength in her left hand was approximately 3/5 and pinch was approximately 3/5 (Tr. at 182).  Plaintiff made a poor fist at 2/5 with her left hand and could neither hold a large object nor pick up and manipulate a coin in her left hand (Tr. at 182).  She could, however, write with her left hand using a pen (Tr. at 182).  Grasp and handshake were approximately 2/5 in Plaintiff's left hand (Tr. at 182).  Plaintiff's prognosis was "guarded to poor" and her activity potential was markedly reduced (Tr. at 183).

On January 31, 2003, Dr. Mullen noted Plaintiff was "completely unable to use her arm and wears a splint" (Tr. at 243, 305).  Later, on September 24, 2003, Dr. Mullen again found that Plaintiff could not use her left hand due to pain and swelling and stated, "Patient is incapable of using [her] left hand and would be unable to do any work that required use of the hand." (Tr. at 261, 311).  On the same date that Dr. Verstraete found Plaintiff's dexterity was preserved, he also found positive Tinel's sign and Phalen's maneuver and diminished grip strength in Plaintiff's left wrist  (Tr. at 209).  Finally, Dr. Joanne Jones, Dr. Williamson, and Dr. Beth Jones each found Plaintiff was limited in reaching all directions, handling and fingering (Tr. at 188, 213, 253).

Upon consideration of the weight or the evidence in the record and balancing contradictory evidence, I find that substantial evidence exists that Plaintiff's arthralgias caused manipulative limitations in her dominant left hand.  Dr. Verstrate is the only doctor who found the dexterity in Plaintiff's left hand to be preserved.  Despite this finding, however, he also found

positive Tinel's sign and Phalen's maneuver and diminished grip strength, suggesting Plaintiff's left hand was not fully functional. Moreover, the fact that the record contains negative objective test results merely indicates that doctors have not been able to isolate the cause of her pain; it does not mean that Plaintiff's pain does not exist. The medical evidence of record, specifically the objective findings of Drs. Bochman, Mullen, Williamson, Joanne Jones and Beth Jones, constitute substantial evidence that such pain was real and resulted in limited use of Plaintiff's left hand.

Consequently, further proceedings are needed determine the effect of the arthralgias in Plaintiff's left hand. On remand, the ALJ is directed to consider vocational expert testimony addressing whether there are jobs in the national economy Plaintiff can perform with, *inter alia*, manipulative limitations. The ALJ shall also base the hypothetical questions on the findings of residual functional capacity rather than the more restrictive limitations used at the February 28, 2005 hearing. Using this evidence, the ALJ shall then determine whether a finding of disability is warranted.

### VI. MENTAL IMPAIRMENT - DEPRESSION

Plaintiff makes two separate arguments falling within this general category. She first argues the ALJ erred in finding her mental impairments were not disabling. She also argues that the ALJ erred in discrediting Nurse Practicioner Hamera's opinion regarding the severity of her depression. Because these arguments are interrelated, they will be addressed together.

In finding Plaintiff was not disabled by her depression, the ALJ found, *inter alia*, that Plaintiff's mental impairment improved with treatment (Tr. at 18). When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Brown v. Barnhart, 390

43

F.3d 535, 540 (8th Cir. 2004).  Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.  Id. (citing 20 C.F.R. § 416.930(b)).

In this case, the record contains substantial evidence that Plaintiff's depression could be controlled by medication and any lack of improvement can be attributed to Plaintiff's failure to take the medications as prescribed.  Plaintiff was first diagnosed with depression on September 11, 2003, but was not prescribed an antidepressant (Tr. at 195-197).  On June 25, 2003, Dr. Reed noted Plaintiff was "[p]erhaps mildly depressed" and prescribed Zoloft 50 mg daily (Tr. at 384-385).  By all accounts, the Zoloft was effective in treating Plaintiff's depression as she requested a refill on September 24, 2003, and stated she thought the medication was helping (Tr. at 310).  The medical records from that date indicate Plaintiff's affect had improved since she started Zoloft; Plaintiff was continued on the drug at the same dosage and was referred to a counselor (Tr. at 311).

Plaintiff began treating at Research Mental Health Services on October 9, 2003, and was diagnosed with major depression, moderate single episode (Tr. at 289-300).   On November 4, 2003, because Plaintiff reported she had only noticed a small change while on Zoloft, Nurse Practicioner Hamera increased her dosage to 100 mg daily (Tr. at 284).  Plaintiff reported improvement in mood on December 23, 2003.  On February 17, 2004, Nurse Practicioner Hamera continued Plaintiff on Zoloft at the same level, noting Plaintiff's mood was only "somewhat depressed" and that she displayed good parenting skills during the interview(Tr. at 272).  Similarly, Plaintiff reported on July 13, 2004, that she was doing "okay" with her medication (Tr. at 269).  Nurse Practicioner Hamera noted Plaintiff appeared euthymic, her affect

44

was within normal range, and she had a GAF of 55-60 (indicating moderate symptoms) (Tr. at 269).

On September 28, 2004, Plaintiff was worse, but had stopped taking her psychiatric medications (Tr. at 415). On October 10, 2004, she reported she did not take her medications approximately two days of the week (Tr. at 411). Nurse Practicioner Hamera instructed Plaintiff to continue taking Zoloft 100 mg daily and also started her on Lamictal 50 mg on October 12, 2004 (Tr. at 414). Again on November 23, 2004, however, Plaintiff reported she had stopped taking her medications one week ago (Tr. at 409). Nurse Practicioner Hamera restarted Plaintiff on Lamictal (Tr. at 409-410).

On December 21, 2004, Nurse Practicioner Hamera observed that Plaintiff's mood was good, she was more animated, was appropriate with her children, and used good problem-solving abilities (Tr. at 419). During the February 28, 2005, hearing, Plaintiff described her depression as being a secondary concern (Tr. at 41). She did not state she was in any way limited by her depression; rather, she testified to an active and social lifestyle (Tr. at 35-39).

This evidence demonstrates that Plaintiff's depression was treatable and improved with medication. Periods during which Plaintiff's depression was not as well controlled directly correspond with the times she stopped taking her medication. Plaintiff does not have a "good reason" for failing to follow her prescribed medication regimen. As a result, the ALJ did not err in finding that Plaintiff was not disabled by her depression. Plaintiff's motion for summary judgment is denied in this ground.

Plaintiff's argument that the ALJ erred in discrediting Nurse Practicioner Hamera's opinion need not be addressed since Plaintiff's failure to take her medication dispositively

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 45 of 53

resolves the issue of whether Plaintiff's depression is disabling. To the extent that Plaintiff's argument could be interpreted as a challenge to the ALJ's failure to include greater psychological limitations in making Plaintiff's residual functional capacity determination,[39] the result remains the same. The ALJ properly gave little weight to Nurse Practicioner's opinions because the record shows, and Nurse Practicioner Hamera's treatment notes detail, that Plaintiff's depression did not create significant limitations when treated by medication. Plaintiff's motion for summary judgment is, accordingly, denied.

### VII. OBESITY

Plaintiff argues that the ALJ erred by failing to consider the impact of her obesity on her ability to work. She states, "It is unclear whether or not the ALJ found [Plaintiff's] obesity to be a further deterrent to her ability to work, because she never addressed the effect of the obesity in her findings." (Doc. No. 12, at 15). I disagree.

The ALJ specifically found that Plaintiff had the following severe impairments: "mild left ventricular hypertrophy, mild left atrial enlargement with preserved heart function and wall motion; hypertension, now controlled; arthralgias; obesity; and depression." (Tr. at 16, 22)(emphasis added). This finding demonstrates that the ALJ did, in fact, consider Plaintiff's obesity in evaluating her ability to work even though the text of the ALJ's opinion does not discuss in depth in the affect Plaintiff's obesity has on her ability to work. See Brown ex rel. Travis v. Barnhart, 388 F.3d 1150, 1153 (8th Cir. 2004)(holding ALJ's specific reference to obesity coupled with review of record as a whole is adequate evidence ALJ took condition into

---

[39]The ALJ's residual functional capacity determination included a finding that Plaintiff had "no more than slight limitation in any area of functioning from depression" (Tr. at 22).

account in denying claim).

Furthermore, the ALJ's opinion was consistent with sources who did expressly consider Plaintiff's obesity in their respective conclusions. That is, the medical evidence of record repeatedly references Plaintiff's obesity but does not indicate any of Plaintiff's doctors considered her to be disabled by this impairment. Her doctors and/or physical therapist instead encouraged her to exercise and walk, a suggestion inconsistent with a finding of disability (Tr. at 39, 42). In her opinion, the ALJ ultimately found that Plaintiff retained the residual functional capacity to stand up to six hours a day, sit six to eight hours a day, and lift twenty pounds occasionally and ten pounds frequently (Tr. at 22). This finding is not inconsistent with the residual physical functional capacity assessments performed by Dr. Joanne Jones, Dr. Williamson, and Dr. Beth Jones, who each expressly mentioned considering obesity in assessing Plaintiff's abilities.[40] I also note that Plaintiff did not testify that her obesity imposed any additional restrictions on her ability to work. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004)(holding ALJ's decision not to discuss obesity was not fatal where, "[a]lthough [Plaintiff's] treating doctors noted that [he] was obese and should loose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions.") As a result, Plaintiff's motion for summary judgment should be denied on this basis.

---

[40]Dr. Joanne Jones stated her conclusions were based, *inter alia*, on Plaintiff being "markedly obese" (Tr. at 186). Dr. Williamson reported Plaintiff's "biggest problem is probably her morbid obesity but she had a pretty good exam other than for slow wide-based gait. Does not seem to have significant problems with her obesity but obviously some problems." (Tr. at 219). Finally, Dr. Beth Jones noted that Plaintiff was obese, but that there was no reason for her shortness of breath other than deconditioning (Tr. at 255).

## VIII.  CREDIBILITY OF PLAINTIFF

Plaintiff contends that the ALJ erred in discrediting her statements regarding the severity of her symptoms and subjective complaints of pain.

### A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit Plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including a plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski, 739 at 1322.

48

The specific reasons for discrediting Plaintiff's subjective complaints are as follows:

## 1. PRIOR WORK RECORD

Plaintiff's work history shows she worked consistently over her lifetime. Her highest annual earnings occurred in 1998, when she made $29,631.74. Her average annual earnings for the twenty-seven years she worked is $11,545.50. Therefore, this factor does not support the ALJ's determination.

## 2. DAILY ACTIVITIES

The ALJ correctly noted Plaintiff led an active lifestyle. Plaintiff testified she spends a typical morning getting her daughter ready for school (Tr. at 35, 36). After taking her daughter to the bus stop, she spends the rest of the day caring for her three-year-old son (Tr. at 35, 36). This morning ritual includes bathing her children, fixing them breakfast, getting them dressed and fixing their hair (Tr. at 119, 144). Throughout the day, Plaintiff cleans up after her children and reads books to her son, watches him ride his bike outside and feeds him (Tr. at 36, 144). When school is out, she walks to the bus stop to pick up her daughter unless the bus driver drops her daughter off at home (Tr. at 36-37). Similarly, Plaintiff told Dr. Bochman on July 17, 2002, that she could cook meals, clean her home, do laundry, go shopping, manage money, care for her children, socialize, shower, and dress herself (Tr. at 181). Plaintiff testified she helps her sister clean, vacuum and do the dishes, and that she is able to run errands and attend some of her daughter's school activities (Tr. at 37). She also reported being able to shop on her own and carry a small bag of groceries or a gallon of milk (Tr. at 125, 180).

Although claims she suffers from debilitating pain, Plaintiff's activities of daily living are not consistent with such pain. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996)(affirming

ALJ's decision to discredit claimant's subjective complaints of pain where claimant "testified he was able to care for at least one of his six children on a daily basis, drive a car when unable to find a ride, and sometimes go to the grocery store"); Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992)(stating claimant's ability to "perform housework, cook, drive, do weekly grocery shopping, and walk to her son's or other nearby friend's residences" was "inconsistent with her testimony of debilitating pain").  Dr. Williamson noted that Plaintiff's activities of daily living seemed "decreased out of proportion to the medical findings" (Tr. at 219).  As a result, the record contains substantial evidence to support the ALJ's decision to discredit Plaintiff's subjective complaints of pain based on her activities of daily living.

The record also contains conflicting statements regarding the degree to which Plaintiff is limited by her impairments.  I note the above-listed evidence is inconsistent with Plaintiff's statements that she could not prepare meals on her own (Tr. at 119, 136, 144), that her sister did all the housework (Tr. at 124, 133), that she could not do laundry or the dishes (Tr. at 136, 143), and that she needed help shopping (Tr. at 120, 134, 137).  Similarly, there is conflicting evidence regarding Plaintiff's ability to walk and climb stairs.

During the February 28, 2005, hearing, Plaintiff testified that she was unable to walk for more than one block (Tr. at 32).  The record also contains evidence of Plaintiff reporting she could not walk more than two blocks (Tr. at 332).  However, Plaintiff indicated on the Ankle Rating System she completed on May 6, 2004, that she experienced marked pain during or after walking more than 1.2 miles (Tr. at 335).  On July 13, 2004, she told Nurse Practicioner Hamera she had been walking up to one mile a day until it got hot (Tr. at 269).

On January 31, 2003, Plaintiff told Dr. Mullen that she climbed the stairs "like a child"

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 50 of 53

(Tr. at 243, 305).  However, on July 17, 2002, she stated her "only problem with walking and climbing stairs [was] shortness of breath" (Tr. at 180-181).  On February 28, 2004, Plaintiff reported she only had a "slight" problem with stairs (Tr. at 350).  Plaintiff testified at the February 28, 2005, hearing that she was able to climb stairs (Tr. at 34).

As a result, I find this factor supports a finding that Plaintiff's complaints were not credible.

### 3.  DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff has consistently maintained that she is in pain.  However, Dr. Williamson found that the severity and duration of Plaintiff's symptoms were disproportionate to the expected severity and expected duration based on her medically determinable impairments (Tr. at 215).  Dr. Beth Jones also found Plaintiff was not fully credible[41] (Tr. at 255).  This factor supports the ALJ's credibility determination.

### 4.  PRECIPITATING AND AGGRAVATING FACTORS

The record is consistent that Plaintiff began suffering from pain following a heart attack (Tr. at 29, 146, 179, 226, 242-243, 307-305, 324, 394, 397).  Her pain was aggravated by walking and bending (Tr. at 132, 332, 352, 354).  This factor weighs against the ALJ's determination.

### 5.  DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

In finding Plaintiff not to be credible, the ALJ noted Plaintiff's noncompliance with her medication regimen (Tr. at 20).  An ALJ may properly consider a claimant's failure to take

---

[41]Dr. Beth Jones found Plaintiff's statements regarding "very consistent pain" in her left arm to be credible (Tr. at 255).

prescription medications in discounting a claimant's subjective complaints of pain.  Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006)(citing Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999)).  The medical evidence of record documents numerous instances where Plaintiff did not take her medications as prescribed.

On June 25, 2003, Plaintiff requested medication refills because she had thrown her old prescriptions away (Tr. at 384).  She told Nurse Practicioner Hamera on February 17, 2004, that she had not been taking her blood pressure medication because she had run out (Tr. at 272).  On September 28, 2004, Plaintiff reported she had discontinued both her psychiatric medications and those prescribed by her primary care physician (Tr. at 415).  Again on October 10, 2004, Plaintiff indicated she did not take her medications approximately two days out of the week (Tr. at 411). She stopped taking her medication again in November of 2004 (Tr. at 409).  Although Nurse Practicioner Hamera opined Plaintiff may be attempting "passive suicide" by not taking her medications, such an opinion is speculative.

Although not medication per se, I also note that Plaintiff was discharged from physical therapy in June of 2004 for failure to attend her sessions (Tr. at 326).  This factor weighs in favor of the ALJ's credibility determination.

## B.  CREDIBILITY CONCLUSION

For these reasons, I find that the record contains substantial evidence supporting the ALJ's findings that Plaintiff's subjective complaints of pain were not credible.  Plaintiff's motion for summary judgment on this basis is, therefore, denied.

### IX. CONCLUSIONS

Accordingly, it is

ORDERED that Plaintiff's motion for summary judgment is remanded in part and denied in part. It is further

ORDERED that the decision of the Commissioner is affirmed with respect to her findings regarding Plaintiff's depression, her consideration of Plaintiff's obesity, and her decision to discredit Plaintiff's subjective complaints of pain. Pursuant to Sentence Six, the decision of the Commissioner is remanded based on the failure to include manipulative limitations in the hypothetical questions posed to the vocational expert, for further proceedings to be conducted in accordance with the directives contained in Section V.


*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge


Kansas City, Missouri
September 28, 2006

Case 4:05-cv-00549-REL   Document 17   Filed 09/29/06   Page 53 of 53